IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA   JUL 2 6 2019
NEWPORT NEWS DIVISION

UNITED STATES OF AMERICA

v.                                                   CRIMINAL NO. 4:19cr49

EZEKIEL JOEL BROWN,

Defendant.

## MEMORANDUM OPINION

The defendant, Ezekiel Joel Brown ("Defendant"), stands charged with two counts in the pending criminal indictment, including robbery of a 7-Eleven in Newport News, Virginia on November 19, 2017 (Count 1), and possessing a firearm in furtherance of such robbery (Count 2). ECF No. 1. On July 2, 2018, Defendant filed a motion to suppress all evidence derived from and tainted by the allegedly unlawful search of a vehicle Defendant was driving on November 19, 2017, in Newport News, Virginia ("Motion to Suppress"). ECF No. 23. On July 23, 2019, the Court conducted a hearing on Defendant's Motion to Suppress and **DENIED** such motion from the bench at the conclusion of the hearing. This Opinion sets forth the Court's reasons for its decision.

### I.     FACTUAL BACKGROUND[1]

At approximately 1:30 a.m. on November 19, 2017, Andrew Gohn, an on-duty police officer with the Newport News Police Department ("NNPD"), received a "Be On the Lookout" call from dispatch, known as a "BOLO," regarding an armed robbery that had just occurred at a 7-Eleven located at 15600 Warwick Boulevard in the Denbigh area of Newport News. Officer Gohn

---

[1] The facts described in this section are drawn from the evidence presented at the July 23, 2019 suppression hearing unless otherwise stated.

1

recalls that, in this initial BOLO, the incident was described as a business robbery with use of a firearm, and the suspect was described as a black male, approximately five-feet-eleven-inches tall, and heavy-set. Sometime later, an updated BOLO was sent out by dispatch describing the firearm as silver and adding that the suspect was wearing white shoes and a jacket.

At approximately 2:10 a.m., around forty minutes after the initial BOLO, Officer Gohn and on-duty Master Police Officer Deaver, with whom Officer Gohn shared a police vehicle that night, responded to a disabled-vehicle call. The disabled vehicle in question was located on Fort Eustis Boulevard in Newport News just before the interstate-64 interchange, approximately a half-mile west of Jefferson Avenue and approximately two miles driving distance from the 7-Eleven on 15600 Warwick Boulevard. When Officers Gohn and Deaver arrived at the scene, they found a disabled, yellow, two-door Chevrolet Cobalt (hereinafter "Chevy Cobalt") facing westbound in the inside travel lane of Fort Eustis Boulevard, blocking traffic. Defendant, who was the driver and sole occupant of the Chevy Cobalt that night, had permission from the owner to drive such vehicle on the evening of November 18, 2017, through the time that the vehicle became disabled on November 19, 2017.

When Officer Gohn arrived at the scene of the disabled vehicle, he was wearing a body camera, but the camera was not activated until approximately five minutes after he arrived. During this unrecorded period of time, Officer Gohn spoke with Defendant. Officer Gohn testified that the Defendant seemed nervous and acted "jumpy" during their interactions. Defendant told Officer Gohn that another driver ran him off the road, which caused the Chevy Cobalt to break down. Officer Gohn offered to secure a towing wrecker for the vehicle and also offered Defendant a ride to his next destination. Defendant verbally accepted both offers. Defendant did not request that a specific towing company be called, so one of the officers called Pete's towing company and

requested a tow of the disabled Chevy Cobalt.

Pursuant to NNPD's official towing policy[2] ("NNPD Towing Policy"), Officer Gohn began filling out a Tow Sheet with respect to the Chevy Cobalt. The information that must be provided on a NNPD Tow Sheet includes, inter alia, the VIN number and mileage of the vehicle; the registered owner and listed driver(s); the type of tow service requested; the time and location of the tow; and the inventory of a vehicle, if one is conducted. An inventory for this purpose consists of documenting any and all items that are located inside a vehicle at the time it is towed. According to NNPD Towing Policy, the Towing Officer must conduct a "complete and thorough inventory" of the vehicle to be towed, unless the officer "assists a motorist whose vehicle is disabled and a specific wrecker by name is requested by that person." See Government Ex. 3, § II.B.7.

Because Defendant had not requested a specific wrecker on the night in question, Officer Gohn planned to conduct an inventory of the Chevy Cobalt in order to complete the Tow Sheet as required. To that end, Officer Gohn asked Defendant if he would like to retrieve anything from the vehicle before it was inventoried and towed. Defendant responded that he would like to retrieve a picture from the vehicle. Sometime during or right after this exchange, Officer Gohn's body camera was activated.[3] The beginning of the body-camera footage shows Officer Gohn, holding a clipboard with the Tow Sheet in one hand, walking a few paces behind the Defendant toward the driver-side door of the Chevy Cobalt.

When Defendant reached the driver-side door, he tried to unlock the door using a car key but seemed to struggle to do so. He indicated to Officer Gohn that the driver-side door lock was broken and began walking around the front of the car toward the passenger door. While Defendant

---

[2] See Government Exhibit 3, NNPD's Operational Manual, "OPS-340 – Towing, Inventory & Impoundment of Vehicles," effective date June 8, 2015, (hereinafter "Towing Policy"), § II.B.2.

[3] The body camera's audio began recording thirty seconds after the video began recording.

3

was walking toward the passenger door, Officer Gohn shined his flashlight through the driver-side window into the front interior of the car, at which time he saw a black and silver firearm lying on the front passenger floorboard in plain view. The firearm was not concealed in any way. Upon seeing the firearm, Officer Gohn yelled to the Defendant, "Hey, hey, hey! Come back here!", at which time the Defendant immediately stopped in his tracks, widened his eyes, and raised his arms high above his head. The following exchange ensued:

| | |
|---|---|
| OFFICER GOHN: | "Okay, there's a firearm in the car, right?" |
| DEFENDANT: | "Yes, sir." |
| OFFICER GOHN: | "Okay, that's something we need to know, okay?" |
| DEFENDANT: | "That is a legal firearm, sir." |
| OFFICER GOHN: | "It is?' |
| DEFENDANT: | "Yes, sir." |

After making his way to the passenger side of the vehicle, Officer Gohn then told the Defendant, "Do me a favor and sit down there for me," pointing toward the street curb that ran parallel to the driver-side of the vehicle. Defendant sat on the curb as instructed. Officer Gohn then asked the Defendant, "You got the keys?", at which point Defendant tossed the car keys to Officer Gohn.

A few moments later, Officer Gohn used the keys to unlock the passenger-side door, which he then opened. At this point, Officer Deaver was standing behind the rear of the vehicle, a couple of feet away from Defendant's location on the curb.

After opening the passenger-side door of the Chevy Cobalt, Officer Gohn crouched down and grabbed the firearm off the passenger-side floorboard. While still crouching, he then shined his flashlight into the interior of the car. Moments later, he pulled the lever on the bottom of the front passenger seat, causing the seat to fold down and slide forward, which gave Officer Gohn access to the backseat. After reaching into the backseat and manipulating a pile of clothing on the

backseat with his hand, Officer Gohn viewed a white sneaker and a red-and-black jacket.[4] Upon seeing these items, Officer Gohn suspected that they could be related to the recent robbery BOLOs and called dispatch via secure channel to request an updated description of the robbery suspect. After receiving such description, Officer Gohn was satisfied that Defendant, the jacket, and the white shoes matched the description. He then directed the Defendant to approach the rear of the car and to place his hands behind his back. Defendant complied, and Officer Gohn placed Defendant in handcuffs.

Sometime after Defendant was handcuffed, one of the responding officers canceled the scheduled tow with Pete's towing company. Officer Gohn testified that, in order to comply with NNPD Towing Policy with respect to towing of vehicles connected to criminal investigations, the officers had to secure the City's designated contract wrecker, Cousins Towing, to tow the Chevy Cobalt. See Government Ex. 2, 11/19/17 NNPD Tow Sheet (listing the reason for hold as "robbery investigation"). NNPD Officer William Grandon, who completed the associated Tow Sheet, conducted a full inventory of the Chevy Cobalt and documented the vehicle's contents on the Tow Sheet. Id. The vehicle was ultimately towed by Cousins Towing at 3:45 a.m. that night. Id.

Though not established at the suppression hearing, both parties proffered in their briefing on the Motion to Dismiss that, sometime after Defendant was detained but still on the roadway,

---

[4] During the suppression hearing, Officer Gohn equivocated about when he first saw these items of clothing. At one point, he testified that he first saw them after entering the car, but at other points, he testified that he may have seen these items in plain view before he gained access to the interior of the vehicle. He explained that, when he reviewed his body-camera footage from that evening, such items were plainly "visible" from the exterior of the car from his vantage point. However, the report Office Gohn prepared shortly after the incident indicates that he only saw the firearm when he approached the vehicle and shined the light inside. See Court Ex. 1, December 13, 2017 Letter from Officer Gohn re: "15600 Warwick Blvd, 7-11 Robbery." Furthermore, Officer Gohn consistently testified throughout the suppression hearing that he did not suspect the Defendant of any criminal activity until Officer Gohn went inside the car and viewed the clothing in the backseat.

two clerks who were working at the 7-Eleven during the robbery in question were brought to the scene to conduct a "show-up" identification of the Defendant. Such clerks reportedly made statements that Defendant could be the perpetrator. The parties further proffered that the Defendant was later taken into custody and transported to NNPD headquarters where law enforcement officers conducted a custodial interrogation of Defendant, during which Defendant made certain incriminating statements, including telling the officers where to find the cash from the robbery. Later that day, Defendant also reportedly made recorded jail calls to friends and family in which he made additional incriminating statements with respect to the robbery.

## II.  LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The suppression or exclusionary rule is a judicially prescribed remedial measure" used to deter Fourth Amendment violations. Segura v. United States, 468 U.S. 796, 804 (1984). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, . . . but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" Id. (internal citations and quotations omitted). However, given the potential costs of suppressing evidence under the exclusionary rule, it must be the Court's "last resort, not [its] first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006).

Because warrantless searches and seizures are generally presumed to be unreasonable under the Fourth Amendment, the Government bears the burden of proving by a preponderance of the evidence that such search or seizure is lawful. United States v. Napan, 769 F. Supp. 2d 969, 971 n.2 (E.D. Va. 2011) (citing Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971) ("The burden is on those seeking the exemption to show the need for it.")).

## III.   DISCUSSION

In his Motion to Suppress, Defendant seeks to suppress the following evidence on the ground that each is derived from and tainted by the allegedly unlawful search of the Chevy Cobalt on November 19, 2017: (1) the firearm seized from the passenger-side floorboard of the Chevy Cobalt; (2) the clothing seized from the backseat of same; (3) all statements made by the two 7-Eleven clerks during the roadside "show-up" that evening; (4) all of Defendant's statements made during the custodial interrogation at the police station later that night; (5) the cash recovered as a result of such custodial statements; and (6) the recorded jail calls Defendant made on the day of his arrest.

In response, the Government does not contest Defendant's standing to challenge the search of the Chevy Cobalt, nor does the Government contest that Officer Gohn conducted a warrantless search of such vehicle on November 19, 2017. Rather, the Government argues that the search of the vehicle was lawful under the Fourth Amendment as a "protective search," and even if not, exceptions to the exclusionary rule apply.

For the reasons below, the Court finds that Officer Gohn's search of the Chevy Cobalt, to the extent it went beyond accessing and securing the firearm from the passenger-side floorboard, violated the Fourth Amendment. However, the Court also finds that all evidence recovered from the vehicle would have inevitably been discovered through a lawful police inventory of the vehicle. Therefore, the exclusionary rule does not apply.

### A.   The Seizure of Defendant on the Curb Was a Lawful Stop.

A person is "seized" within the meaning of the Fourth Amendment when an "officer by means of physical force or show of authority terminates or restrains his freedom of movement." Brendlin v. California, 551 U.S. 249, 254 (2007) (internal citations and quotation marks omitted). The Court finds that the Defendant was seized for Fourth Amendment purposes when he complied

7

with Officer Gohn's unequivocal instruction to sit on the curb. See United States v. Carroll, 491 F. App'x 900, 903 (10th Cir. 2012) (holding that the defendant was seized when he complied with the officer's command to sit on the curb). Because this was a warrantless seizure, the Government must demonstrate that it was reasonable within the meaning of the Fourth Amendment.

The Government argues that Defendant's seizure on the curb was a lawful investigatory stop under Terry because Officer Gohn had "reasonable, articulable suspicion that criminal activity [was] afoot" once he saw the firearm in plain view on the floorboard of the Chevy Cobalt. Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). "Because reasonable suspicion is an objective test, we examine the facts within the knowledge of [Officer Gohn] to determine the presence or nonexistence of reasonable suspicion; we do not examine the subjective beliefs of [Officer Gohn] to determine whether he thought that the facts constituted reasonable suspicion." Untied States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004).

The Court finds that, by the time Officer Gohn saw the firearm in plain view on the floorboard of the Chevy Cobalt and verbally confronted the Defendant about it, he had reasonable, articulable suspicion to justify a Terry stop of Defendant. To be sure, in states like Virginia where individuals are permitted to openly carry firearms, "the exercise of this right, without more, cannot justify an investigatory detention." United States v. Black, 707 F.3d 531, 540 (4th Cir. 2013). But here, there were several articulable facts – beyond the mere presence of the unconcealed firearm – that were within Officer Gohn's knowledge that justifiably aroused his suspicion that criminal activity was afoot.

First, Defendant seemed nervous and acted "jumpy" during all his interactions with Officer Gohn that night. Second, Defendant never mentioned the presence of a firearm to the officers nor advised Officer Gohn that he would likely see a firearm as he approached the vehicle, even though

Defendant knew the vehicle would soon be towed. Third, when Officer Gohn asked Defendant if he wanted to retrieve anything from the vehicle before the tow, Defendant only indicated that he wanted to retrieve a picture, an odd and impractical request under the circumstances. Fourth, when Defendant tried to unlock the driver-side door with the car keys, with Officer Gohn close behind him, Defendant seemed to struggle and indicated that the lock might be broken. So, Defendant moved away from the officer toward the passenger door of the vehicle. Fifth, the moment Officer Gohn saw the firearm on the floorboard and yelled to Defendant, "Hey, hey, hey! Come back here!", Defendant immediately stopped in his tracks, widened his eyes, and raised his arms high above his head, as if caught. Officer Gohn had made no threatening gestures or movements toward Defendant and had not instructed Defendant to raise his hands. Sixth, by the time Office Gohn spotted the firearm, Defendant was already on the passenger side of the vehicle about to unlock and open the passenger-side door, which would have given the Defendant easy and ready access to the firearm. Viewing all of these factors together, it was reasonable to suspect that criminal activity with respect to the firearm had been or was about to be committed by the Defendant. Therefore, it was reasonable and lawful for Officer Gohn to stop Defendant on the curb while the officers investigated the matter further.

**B.     The Police Violated the Fourth Amendment by Conducting a Search of the Vehicle Beyond Accessing and Securing the Firearm.**

The next issue before the Court is whether Officer Gohn had lawful grounds to conduct a warrantless search of the Chevy Cobalt. The Government argues that the search was lawful as a "protective search" because Officer Gohn had "a reasonable fear for his own safety based on an articulable suspicion that the suspect may be armed and dangerous." United States v. Holmes, 376 F. 3d 270, 275 (4th Cir. 2004) (internal quotations omitted). Because Officer Gohn spotted one firearm in the vehicle, the Government concludes that it was reasonable for him to believe that

there were others, and a protective search of the entire car was therefore justified.

The Government relies heavily on Holmes to justify the search of the entire Chevy Cobalt. In Holmes, the police conducted an investigatory stop of a vehicle, in which the defendant was an occupant, on the suspicion that defendant was a violent gang member with numerous violent felony convictions and an outstanding arrest warrant. 376 F.3d at 277–78. The Fourth Circuit held that, because the officers reasonably believed (i) that the defendant was dangerous, (ii) that he may have weapons in the vehicle, and (iii) that he may gain ready access to such weapons during or immediately after the conclusion of the stop, the officers' protective search of the entire vehicle was lawful. Id. at 280.

Here, as discussed above, Officer Gohn reasonably believed that Defendant had engaged in or was about to engage in criminal activity with respect to the firearm on the floorboard. Officer Gohn also reasonably believed that permitting Defendant to access such firearm was dangerous given that such firearm "could unexpectedly and fatally be used against the officer." Terry, 392 U.S. at 23. However, in stark contrast to Holmes, there is no evidence here that, at the time Officer Gohn searched the car, the officers had reason to believe that Defendant was a member of a violent gang, had a violent criminal history, or that he had other weapons in the vehicle. Rather, the officer's reasonable suspicion was limited to the firearm in plain view on the floorboard based on the Defendant's suspicious conduct with respect to and surrounding such firearm.

For this reason, the Court finds that the officer's search of the interior of the Chevy Cobalt, beyond the actions necessary to access and secure the firearm from the passenger floorboard, violated the Fourth Amendment. Therefore, the items of clothing recovered from the backseat of the vehicle were obtained by an unlawful search.

### C. The Evidence Obtained from the Unlawful Search Would Have Been Inevitably Discovered by Lawful Means.

Nevertheless, the Court finds that the exclusionary rule does not apply to the fruits of this unlawful search because the inevitable-discovery exception clearly applies. This exception allows unlawfully obtained evidence to be admitted at trial if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444 (1984). That such lawful discovery would have happened cannot be based on a "string of conjecture" or mere speculation. United States v. Thomas, 955 F.2d 207, 209 (4th Cir. 1992). Rather, the court must "view[] affairs as they existed at the instant before the unlawful search" and determine "what *would have happened* had the unlawful search never occurred." United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992) (emphasis in original).

Here, the Government showed by a preponderance of the evidence that, had the unlawful search never occurred, a lawful police inventory search of the Chevy Cobalt would have occurred from which all evidence retrieved from such vehicle would have been inevitably discovered. At the time Officer Gohn approached the Chevy Cobalt, he was already planning and preparing to conduct an inventory of the vehicle. Pete's Towing had already been called for a tow. Officer Gohn already had the Tow Sheet in hand. In fact, the sole reason Officer Gohn and Defendant approached the Chevy Cobalt, as depicted in the body-camera footage, was because Officer Gohn suggested that the Defendant grab what he needed from the vehicle before it was inventoried and towed. Officer Gohn also testified that this planned inventory was mandatory, not discretionary, under NNPD Towing Policy.

The NNPD Towing Policy confirms that this planned inventory was a certainty, not a mere probability, in this case. See Government Ex. 3, § II.B ("Towing a Vehicle"). Section II.B.7 of

such policy provides that, when towing a vehicle, "[t]he Towing Officer *shall* conduct a complete and thorough inventory of the vehicle," with one exception: "An inventory is not necessary if the Towing Officer assists a motorists whose vehicle is disabled and a specific wrecker by name is requested by that person." Id. § II.B.7 (emphasis added). The policy further provides that, if any firearms are discovered during the inventory, they "shall be removed from the vehicle and placed in Property and Evidence." Id. In this case, Defendant did not request a specific wrecker by name. Therefore, the responding officers called a wrecker from the approved "District Towing List" (here: Pete's Towing) and were thus required by NNPD Towing Policy to conduct an inventory before it was towed. Considering these facts, it is clear that all evidence recovered from the Chevy Cobalt would have inevitably been discovered via police inventory that would have been conducted had the illegal search never happened.

In rebuttal, Defendant argued that the fact that Pete's Towing was ultimately cancelled in this case shows that the tow of the Chevy Cobalt and resulting inventory search were not inevitable. However, such cancellation occurred only after the Defendant was suspected to be the robber and the Chevy Cobalt was flagged for criminal investigation. The NNPD Towing Policy specifically requires the Towing Officer to use the City's "Contract Wrecker" to tow all vehicles involved in criminal investigations to the appropriate police compound. Id. § II.F. The testimony at the hearing established that Cousins Towing was the City's Contract Wrecker at the time, and that Cousins Towing in fact towed the Chevy Cobalt that night consistent with the tow policy. See Government's Ex. 2. Therefore, Defendant has not shown that the scheduled tow of Defendant's would have been cancelled had the unlawful search never happened.

Lastly, Defendant argued that an inventory search is not "inevitable" for purposes of the doctrine "unless it is performed on every single vehicle in the situation of the defendant's vehicle

at the time the unlawful search was conducted." ECF No. 29 at 10. Defendant therefore contends that, because the NNPD towing policy allows the Towing Officer to cancel or reject a wrecker for various reasons, the scheduled tow and resulting inventory of the Chevy Cobalt were not "inevitable" in this case. See Government's Ex. 3 § II.I. However, Defendant misconstrues the Government's burden. The Government need not show that an inventory search would happen in every similar case; it need only show that an inventory search would have happened in *this* case. Eng, 971 F.2d at 861. As explained above, the Government has met its burden. Therefore, the exclusionary rule does not apply.[5]

IV. **CONCLUSION**

For the foregoing reasons, at the conclusion of the suppression hearing, the Court **FOUND** that the police conducted an unlawful search of the vehicle Defendant was driving on November 19, 2017, which resulted in the discovery of important evidence in Defendant's case. However, the Court also **FOUND** that such evidence would have been inevitably discovered by lawful means had such unlawful search never occurred. Therefore, the exclusionary rule does not apply. Accordingly, Defendant's Motion to Suppress was **DENIED**. ECF No. 23.

The Clerk is **DIRECTED** to forward a copy of this Opinion to all Counsel of Record.

**IT IS SO ORDERED.**

/s/
Robert G. Doumar
Senior United States District Judge
UNITED STATES DISTRICT JUDGE

Norfolk, VA
July 26, 2019

---

[5] The Government also argues that the independent-source doctrine applies here, which would provide an additional exception to the exclusionary rule. See ECF No. ECF No. 25 at 9. The Court has already found that the exclusionary rule does not apply and therefore declines to reach that issue.

13